UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANK GORDON CLARK,

      Plaintiff                     Civil Action No. 18-13758

v.                            HON. AVERN COHN
                                   U.S. District Judge
                                   HON. R. STEVEN WHALEN
COMMISSIONER OF SOCIAL       U.S. Magistrate Judge
SECURITY,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Frank Gordon Clark ("Plaintiff") brings this action under 42 U.S.C. § 405(g) challenging a final decision of Defendant Commissioner ("Defendant") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment [Docket #21] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #15] be DENIED.

## I. PROCEDURAL HISTORY

On February 19, 2016, Plaintiff filed an application for DIB, alleging an onset of disability date of December 12, 2015 (Tr. 182). After the initial denial of the claim, Plaintiff requested an administrative hearing, held on May 9, 2018 in Livonia, Michigan before

-1-

Administrative Law Judge ("ALJ") Martha M. Gasparovich (Tr. 37).  Plaintiff, represented by attorney Steven H. Stilman, testified (Tr. 42-67), as did Vocational Expert ("VE") Joanne White (Tr. 67-75).  On May 30, 2018, ALJ Gasparovich found that Plaintiff was not disabled (Tr. 17-31).   On October 4, 2018, the Appeals Council denied review (Tr. 1-4).   On December 4, 2018, Plaintiff filed for judicial review of the Commissioner's final decision in this Court.

## II.  BACKGROUND FACTS

Plaintiff, born December 5, 1978, was 39 when the ALJ issued her decision (Tr. 31, 182).  He completed high school and received training in auto body repair (Tr. 219).  He worked previously as an auto body technician and as a "ground help" worker (Tr. 219).  He alleges disability as a result of Complex Regional Pain Syndrome, cardiac disease, and "anxiety/stress" (Tr. 218).

### A.  Plaintiff's Testimony

*Prior to his client's testimony, Plaintiff's counsel amended the alleged onset of disability date to December 5, 2013* (Tr. 41)

Plaintiff then offered the following testimony:

He received vocational training in auto body repair from Oakland Technical Center during high school (Tr. 43).  He lived in Holly, Michigan (Tr. 42).  His former work as a grounds helper ("grounds keeper") consisted of fall cleanup and shoveling and salting sidewalks (Tr. 44).  Before ceasing work in December, 2013,  he was working as an auto body repairer (Tr. 45).  He stopped working the week after injuring his left ankle because his employer "pushed" him to take a Workers' Compensation leave due to concern about the use of crutches in the workplace (Tr. 45).

Plaintiff was disabled due to severe left ankle pain (Tr. 46). He was right-handed (Tr. 46). Due to ankle pain, he was required to elevate his ankle as high as waist-height for at least 15 minutes at random intervals over the course of the day (Tr. 47). He attributed his particularly severe ankle pain during the hearing to anxiety (Tr. 48).

Plaintiff experienced anxiety since a heart attack in 2010 followed by double bypass surgery (Tr. 49). He subsequently developed a phobia of bridges and heights (Tr. 49). He sought psychiatric treatment and medication to control the condition (Tr. 49). He made an unsuccessful attempt to stop the psychotropic medication in 2015 and at the time of hearing, took medication (Tr. 50).

He was unable to stand for more than 10 minutes due to right hip pain due to postural changes resulting from the left ankle injury (Tr. 51). The use of a cane did not fully relieve his hip or ankle pain (Tr. 51). He was limited to walking around 75 feet at a time (Tr. 51). He was limited to sitting for half an hour (Tr. 52). He was unable to lift more than eight pounds since injuring his right shoulder six month earlier during archery practice (Tr. 52). He had not received treatment for the shoulder condition (Tr. 53). He also experienced shooting left wrist pain and was developing Carpal Tunnel Syndrome ("CTS") (Tr. 52-53).

On a typical day, Plaintiff drank coffee, took a shower, played with his children, watched television, and read books; adding that his five children, ages four to seventeen, kept him busy (Tr. 53). He spent significant time driving his children from one appointment to another (Tr. 53). He was unable to lift his two youngest children (Tr. 54). He was able to perform light housekeeping chores on his "good" days (Tr. 54).

In response to questioning by his attorney, Plaintiff testified that he was unable to stand (without leaning) for more than three minutes (Tr. 54). He clarified that while he was able to lift up to eight pounds, he was unable to carry that amount while using a cane (Tr.

56).  On a "bad" day, he was confined to bed for up to three hours, adding that such days occurred around once a week (Tr. 57).  His recliner allowed him to elevate his legs to higher than waist level (Tr. 58).  He needed to elevate his legs for approximately 50 percent of his waking hours (Tr. 58).  He fractured his left wrist while using an all-terrain vehicle while helping his son clean up the back yard (Tr. 59).  On occasion, his ankle pain became so bad that he was unable to concentrate on conversations, adding that his fiancée sometimes accused him of forgetting earlier conversations (Tr. 60).  He opined that he was unable to perform any gainful activity due to his need to elevate his leg and the inability to focus (Tr. 61).  He estimated that he would miss work two days every week (Tr. 62).  His treating physician, Dr. Green "gave [him] the option" of using a cane (Tr. 62).  His treatment for the ankle pain was limited to pain medication (Tr. 63).  Opiate pain medication caused the side effects of concentrational problems and headaches (Tr. 63).  He had tried other medications but had experienced "major side effect[s]" with all of them (Tr. 63).

Plaintiff's former work as an auto body repairer required him to lift up to 100 pounds on occasion and the grounds keeper position, 40 (Tr. 64-65).  He underwent sympathetic nerve blocks but discontinued the treatment due to pain at the injection site (Tr. 66). Although he was in his 30s, his physical problems made him feel at least 65 (Tr. 67).

### B.    Medical Evidence

#### 1.    Records Related to Plaintiff's Treatment

A March, 2014 MRI of the left ankle showed a small osteochondral defect with a possible ligament tear (Tr. 378).  In May, 2014, Plaintiff underwent left ankle arthroscopy performed without complications (Tr. 381-382).  Followup records note that he was capable of full weight bearing (Tr. 400).  After a diagnosis of peroneal tendinitis, he underwent a September, 2014 surgery for repair of the left ankle tendon (Tr. 384, 404).  The following

month, he denied psychological or neurologic problems (Tr. 395). A November, 2014 scan of the left lower extremity showed no significant abnormalities (Tr. 367). Chris Schoenherr, M.D. noted that the scan findings were "more consistent with disuse" than pathology (Tr. 448). The following month, Plaintiff reported "constant" ankle pain (Tr. 313). Plaintiff exhibited an antalgic gait but full muscle strength (Tr. 316-317).

In January, 2015, Plaintiff reported level "four" ankle pain on a scale of one to ten (Tr. 354). He demonstrated a decreased range of motion and strength (Tr. 352). Dr. Schoenherr, found that Plaintiff was capable of sedentary work allowing him to "sit as needed" with no prolonged standing or walking (Tr. 358). Plaintiff was prescribed ankle exercises (Tr. 355). He reported no problems with prolonged sitting, reaching overhead, or lifting at least 20 pounds (Tr. 336). He denied psychological problems (Tr. 393). February, 2015 physical therapy records note reduced pain and improved circulation (Tr. 349). Dr. Schoenherr noted that Plaintiff had not followed up on a referral for pain management (Tr. 306, 308). The same month, Plaintiff underwent a nerve block (Tr. 346). March, 2015 records note an increase in mobility despite Plaintiff's report of "constant pain" (Tr. 342). The following month, Plaintiff reported no improvement with the use of Cymbalta (Tr. 304). He denied neurologic or psychological problems (Tr. 387). May, 2015 records note possible opiate "dependence issues" (Tr. 302, 431). The following month, Plaintiff sought emergency treatment for what he believed was a heart attack but turned out to be palpitations (Tr. 482). He reported anxiety since having a heart attack at the age of 31 (Tr. 482). He admitted to smoking one-and-a-half packs of cigarettes every day (Tr. 482). An EKG was unremarkable (Tr. 482).

In July, 2015 neurologist David A. Green noted Plaintiff's report of chronic left ankle pain since a November, 2013 workplace injury (Tr. 550). Plaintiff reported that the pain was exacerbated by movement but no sleep disturbances (Tr. 550). He reported partial pain control from Norco (Tr. 550). Dr. Green noted that the left foot was cooler than the right (Tr. 552). He noted full strength and the ability to stand without difficulty (Tr. 552). He prescribed physical therapy and Cymbalta (Tr. 553-554). He diagnosed Plaintiff with Complex Regional Pain Syndrome ("CRPS") (Tr. 552). A July, 2015 stress test was negative (Tr. 492). The following month, Plaintiff reported no improvement from physical therapy or Cymbalta (Tr. 299, 554). Plaintiff again demonstrated normal muscle strength and tone (Tr. 555). He reported good results from Norco (Tr. 298, 425). He exhibited "skin abrasions along the shin that he received while cutting . . . brush" (Tr. 425). August, 2015 cardiologic records note that Plaintiff was "doing well" (Tr. 484). He was advised to seek psychiatric help, rather than cardiac treatment, for physical manifestations of anxiety (Tr. 485). Dr. Schoenherr's October, 2015 records note good results from OxyContin (Tr. 294). Plaintiff reported an improvement in pain by sitting (Tr. 295). He denied depression but reported low energy (Tr. 473). In December, 2015, Dr. Green noted that a recent MRI of the left ankle was normal (Tr. 560, 564). Plaintiff denied side effects from Norco (Tr. 455).

Dr. Green's January, 2016 treatment records note normal pin prick sensation over all four extremities and the ability to stand without difficulty (Tr. 459). Dr. Green noted full muscle strength (Tr. 459). The same day, Dr. Green completed an assessment of Plaintiff's work-related abilities, finding that as a result of CRPS, Plaintiff was limited to lifting 10 pounds occasionally and precluded from all carrying; was able to sit for four hours in an eight-hour workday and walk and stand for one hour apiece; and required the use of a

"pillow" to elevate the legs while sitting[1] (Tr. 372, 462, 636, 639 469).  He found that Plaintiff was limited to sitting, standing, and walking to one hour apiece over the course of an eight-hour workday (Tr. 462).  He found that Plaintiff was unable to perform any walking without the use of a cane and would be required to take unscheduled breaks over the course of the workday (Tr. 462).  He limited Plaintiff to occasional manipulative activity with the right upper extremity and precluded the use of foot controls (Tr. 462-463).  He precluded all postural activity other than occasional climbing of ramps and stairs (Tr. 464).  He precluded work involving unprotected heights, moving machinery, operating a motor vehicle, humidity, airborne hazards, temperature extremes, and vibrations (Tr. 465).  He found that Plaintiff's physical conditions would interfere frequently or constantly with concentration (Tr. 465).  He found that Plaintiff was unable to shop; walk without a walker or two crutches; or prepare simple meals (Tr. 466).  A March, 2016 motor examination by Dr. Green was unremarkable (Tr. 622).

June, 2016 psychological intake records note Plaintiff's report of phobias (Tr. 525).  Plaintiff denied psychoses (Tr. 522).  Thought content and concentration were within normal limits (Tr. 525).  Plaintiff demonstrated normal judgment (Tr. 525).  He was diagnosed with panic disorder with agoraphobia and alcohol abuse (Tr. 519).   He reported stress while driving on a highway, going over bridges, and home-related stress (Tr. 505).  He reported that he and his children hunted (Tr. 505).  The following month, he reported that he and his family were going camping later in the month (Tr. 502).

-----

[1]However, other copies of what appears to be the same assessment state that Plaintiff was required to elevate his leg to waist height (Tr. 637, 639).

Dr. Green's July, September, and December 2016 examination records were wholly consistent with earlier examination findings (Tr. 625, 628, 631).  In September, 2016, Dr. Green prescribed an increase of Elavil, a Norco refill, and a handicap parking permit (Tr. 675).  Cardiologic records from the same month noted a steady gait with the use of a cane (Tr. 697).  November, 2016 records note that Plaintiff relaxed by practicing archery (Tr. 601).

March, 2017 records note that Plaintiff drank one to two beers daily (Tr. 566). Treating records from the following month note that Ativan controlled Plaintiff's anxiety (Tr. 586).  Counseling records from the following month note that Plaintiff's self-description of psychological symptoms met the criteria for Post Traumatic Stress Disorder ("PTSD") (Tr. 581).  Plaintiff reported drinking several beers every day (Tr. 579).  May, 2017 records note "fairly infrequent episodes of chest pain" (Tr. 693).   Plaintiff reported anxiety-related palpitations around once a week (Tr. 693).  In May, 2017, Plaintiff broke his forearm while driving an all-terrain vehicle (Tr. 566, 686, 723, 729).  Plaintiff reported CTS in the past but no recent numbness or tingling of the fingers (Tr. 731).  The following month, he underwent a fracture repair and carpal tunnel release surgery without complications (Tr. 683).  Followup records from the next month note Plaintiff's report of moderate pain but that he was able to move his fingers without numbness or tingling (Tr 688). He was prescribed physical therapy (Tr. 748).  Post-surgical imaging studies were unremarkable (Tr. 742).  Dr. Green's August, 2017 records note an unremarkable neurological examination with a normal gait (Tr. 634). Psychological records from the next month note normal concentrational abilities (Tr. 810, 813).  In October, 2017, Plaintiff was hospitalized for five days for cellulitis/lymphangitis of the right groin and lower leg (Tr. 768).  He was discharged in stable condition (Tr. 778). Hospital records note a "chronic smoker's cough" (Tr. 780).

January, 2018 records by Dr. Green note that Plaintiff was able to stand without difficulty (Tr. 793). A February, 2019 cardiac catheterization revealed essentially unremarkable results (Tr. 817-818). March, 2018 psychological treating records note a normal mood, concentration, and affect (Tr. 801-802).

## 2. Non-Treating Sources

In June, 2016, Muhammad Khalid, M.D. performed a non-examining review of the records pertaining to Plaintiff's physical condition, finding that Plaintiff could lift/carry 20 pounds occasionally and 10 frequently; sit, stand, or walk for six hours in an eight-hour workday; and push/pull without limitations (Tr. 86). Dr. Khalid found Plaintiff was limited to frequent (as opposed to *constant*) postural activity except for a limitation to occasional climbing of ladders, ropes, and scaffolds (Tr. 86).

In July, 2016, Harold S. Sommerschield, Ph.D. performed a consultative mental status examination, noting Plaintiff's history of a left ankle injury with residual pain and an October, 2010 heart attack (Tr. 538). Plaintiff reported anxiety and panic attacks beginning around three months after heart surgery but admitted that he had not had a second heart attack (Tr. 538). He alleged "a fear of bridges and certain open areas" which was triggered while driving (Tr. 539). He reported good results from Lexapro (Tr. 539). He described himself as a "social person" and liked to talk to people including individuals associated with his son's Boy Scout troop (Tr. 540). He reported limitations in the ability to hunt and fish (Tr. 540).

Dr. Sommerschield noted that Plaintiff had a limp and used a cane but did not appear to be in significant pain (Tr. 541). Plaintiff's speech was "logical and relevant" with a normal mood but "significant somatic concerns" (Tr. 541). He appeared fully oriented (Tr. 541). Dr. Sommerschield found Plaintiff's anxiety prognosis "favorable," noting that the "overall prognosis" would be determined by the medical conditions (Tr. 542). He found that

Plaintiff could have "mild" limitation in concentration but "sufficient ability to relate appropriately with co-workers and supervision" with socially appropriate behavior (Tr. 543).

The same month, Michele Leno, Ph.D. performed a non-examining review of the treating and consultative records on behalf of the SSA, finding that due to anxiety, Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 84).

### C.    Vocational Expert Testimony

VE Joanne White classified Plaintiff's previous work as a auto body technician as skilled and exertionally medium (heavy as performed) and work as a grounds keeper skilled and heavy (medium as performed)[2] (Tr. 70). The ALJ then posed the following set of limitations, describing a hypothetical individual of Plaintiff's age, educational level, and work experience:

> Assume the individual could stand and walk six of eight hours, sitting would be unlimited. The individual could lift up to 20 pounds occasionally and 10 pounds frequently; kneeling, crawling, climbing, squatting would be limited to occasionally. The individual could never climb ladders, ropes, or scaffolds; would need to avoid extremes of temperature; would need a clean air environment free from concentrated levels of dust, fumes, chemicals, gases, and other airborne irritants; and would require a low stress environment defined as no quick decision making and no quick judgment required on the job. The individual would be unable to perform jobs that are fast pace, high production, or frequent changes in task, expectations, or locations (Tr. 70).

---

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

The VE testified that the above-described hypothetical individual would be unable to perform Plaintiff's past work but could perform the light, unskilled work of garment sorter (170,000 jobs in the national economy); merchandise marker (800,000); and warehouse checker (600,000) (Tr. 71).

The VE testified further that if the individual were additionally limited to no more than two hours of standing or walking in an eight-hour day and the inability to lift more than 10 pounds, he could perform the sedentary work of an account clerk (186,000); order clerk (185,000); and document preparer (600,000) (Tr. 72). She testified that the need to take unscheduled breaks for 10 to 15 minutes at least once a day, or, the need to miss two to three days of work each month would eliminate all competitive employment (Tr. 72-73). The VE stated that her testimony was based on the information found in the *Dictionary of Occupational Titles* ("*DOT*"), except for the testimony regarding work breaks and absences which was based on her own professional experience (Tr. 72-73).

In response to questioning by Plaintiff's counsel, the VE testified that the need to elevate the legs at least as high as "tabletop" level for 20 percent of the workday would also preclude all competitive employment (Tr. 73-74). She stated that none of the above-cited jobs could be performed if the hypothetical individual had the use of only one hand (Tr. 74). She testified that the need to be off-task for at least 20 percent of the workday (excluding scheduled breaks) would also preclude all work (Tr. 75).

### D.  The ALJ's Decision

Citing the medical records, the ALJ determined that Plaintiff experienced the severe impairments of "status-post left ankle arthroscoopy and synovectomy; type 1[CRPS] of the left ankle; history of coronary artery disease []; hypertension; COPD; obesity; anxiety; panic disorder with agoraphobia; [PTSD]; and alcohol abuse" but found that none of the conditions

-11-

met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 19-20). The ALJ found that the impairments of the wrist fracture and sleep apnea were non-severe impairments (Tr. 20). She found that Plaintiff experienced mild limitation in remembering or applying information, interacting with others; and adapting or managing himself and moderate limitation in concentration, persistence, or pace (Tr. 21-22). The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform exertionally light work subject to the following restrictions:

> [S]tand and walk six of eight hours; sitting would be unlimited; could lift up to 20 pounds occasionally and 10 pounds frequently; kneeling, crawling, climbing, and squatting would be limited to occasionally; could never climb ladders, ropes, or scaffolds; would need to avoid extremes of temperature; would need a clean air environment free from concentrated levels of dust, fumes, chemicals, gases, and other airborne irritants; requires a low stress environment defined as no quick decision making and no quick judgment required on job; and would be unable to perform jobs that are fast pace, high production, or have frequent changes in task expectations or locations (Tr. 22).

Citing the VE's testimony, the ALJ found that while Plaintiff was unable to perform his past relevant work, he could perform the exertionally light jobs of garment sorter, merchandise marker, and warehouse checker (Tr. 30, 77).

The ALJ discounted Plaintiff's allegations of disability. She cited June, 2015 records showing the ability to stand without difficulty with normal motor strength and neurologic findings (Tr. 24). She noted that Plaintiff's treatment for left ankle pain was restricted mostly to medication (Tr. 24). The ALJ observed that the cardiac conditions were well controlled with treatment (Tr. 24-25). She accorded "little weight" to Dr. Green's multiple "disability" opinions (Tr. 25, 27-28). She found "no support" for Dr. Green's finding of extreme exertional and manipulative limitations, noting that his January, 2016 opinion that Plaintiff could sit for up to four hours at a time," with the additional finding that he was

-12-

restricted to sitting one hour in an eight-hour workday, was "internally inconsistent" (Tr. 28).

### III.  STANDARD OF REVIEW

 "Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, — U.S. —, 139 S.Ct. 1148, 1154 (2019)(punctuation altered)(*citing Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938))(emphasis deleted).   The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  *Biestek* at 1152; 42 U.S.C. §405(g).   "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(*citing Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.1994)).

The standard of review is deferential and  "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir.  1986)(*en banc*).  Where  substantial evidence supports the ALJ's decision, the reviewing court "defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Commissioner Of Social Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)(*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)).   However, in determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may

look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV.  FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Her v. Commissioner of Social Sec.*, 203 F.3d 388, 391–92 (6th Cir. 1999).

## V.  ANALYSIS

### A.  The Treating Physician Analysis

Plaintiff disputes the ALJ's accord of only "little weight" to orthopedist Dr. Green's multiple disability opinions.  ECF No. 15, PageID.885.  Plaintiff argues that the ALJ failed to address Dr. Green's finding of the need to elevate the left leg while working.  ECF No. 15, PageID.886.

-14-

Dr. Green qualifies as a "treating physician." For the period under consideration, the opinion of a treating physician should be given controlling weight if "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and "not inconsistent with the other substantial evidence." *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004) 20 C.F.R. § 404.1527(c)(2)); SSR 96–2p, 1996 WL 374188, at *5 (1996)).[3]

In the instance where the ALJ declines to accord controlling weight to a treating opinion, he or she must provide "good reasons" for discounting the treating opinion. *Gayheart v. Comm'r of Social Security*, 710 F.3d 365, 376 (6th Cir. 2013); *Wilson,* 378 F.3d at 544–546 (6th Cir. 2004); SSR 96–2p at *5. The failure to articulate "good reasons" for rejecting a treating physician's opinion constitutes reversible error. "[T]he Commissioner imposes on its decision-makers a clear duty to 'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.' " *Gayheart*, at 376 (*citing* SSR 96–2p, at *5).

---

[3]

The administration rescinded SSR 96-2p on March 27, 2017. *See* Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 82 FR 15263-01 (Mar. 27, 2017). Under the new rules, ALJs will weigh both treating and non-treating medical evaluations based on how well they are supported by the remainder of the record. 20 C.F.R. §§ 404.1520b; 416.920c. The "new rules, however, apply only to claims filed on or after March 27, 2017." *Hancock v. Commissioner of Social Security*, 2017 WL 2838237, at *8 (W.D. Mich. July 3, 2017)(*citing Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 FR 5844-01 (Jan 18, 2017) ). Because current Plaintiff filed his claim well before March 27, 2017, SSR 96-2p applies.

ALJ Gasparovich accorded little weight to Dr. Green's November, 2015 statement that Plaintiff was "totally disabled," noting that the finding stood at odds with Dr. Green's own treating records showing symptom improvement with medication on good muscle strength (Tr. 27-28, 562).  The ALJ also acknowledged and discussed Dr. Green's January, 2016 finding that Plaintiff was unable to sit, stand, or walk for a total of eight-hours a day; was precluded from all postural activity; experienced significant manipulative limitation; required leg elevation; and would be required to recline for significant portions of the workday (Tr. 28, 459-466).

The ALJ's two-paragraph rationale for rejecting Dr. Green's  January, 2016 assessment satisfies the substantive and procedural requirements of the treating physician rule (Tr. 28).  The ALJ noted that neither Dr. Green's treating records nor the record as a whole supported disability level limitations (Tr. 28).  She cited treating records showing that Plaintiff experienced some degree of symptom relief from Norco and Elavil and "minimal" clinical findings supporting the professed severity of left ankle limitation (Tr. 28).  She noted that Dr. Green's repeated  observation that Plaintiff was able to stand without limitation contradicted his opinion that Plaintiff was limited to standing one hour in an eight-hour workday (Tr. 28).  She found that Dr. Green's manipulative limitation of only occasional use of the upper right extremity contradicted numerous showings of normal muscle strength and tone (Tr. 462).  She noted that Dr. Green's assessment was internally inconsistent, stating at one point that Plaintiff was limited to sitting for four hours in an eight-hour workday and elsewhere that he could sit for only one hour (Tr. 28, 462).

While Plaintiff also faults the ALJ for failing to provide specific reasons for rejecting the need for leg elevation, the ALJ mentioned the leg elevation finding in her summation of Dr. Green's assessment (Tr. 28).  She also cited records showing that Plaintiff was able to

stand without limitation and noted specifically that the alleged need for leg elevation was not supported by the treating records (Tr. 26, 28). Her acknowledgment of the alleged limitation and her finding that the record did not support the need for leg elevation constitutes "sufficiently specific" reasons for the accord of "little weight" to this portion of Dr. Green's assessment. *Gayheart*, at 376. While Plaintiff cites the VE's testimony that the need for waist-high leg elevation for 20 percent of the workday would be work-preclusive (Tr. 74), this argument is mooted by the ALJ's well supported and explained rejection of the purported limitation. Accordingly, the ALJ did not err by declining to include the leg elevation restriction in question to the VE forming the basis of the Step Five job findings (Tr. 70). *See See Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 118–119 (6th Cir. 1994)(ALJ not required to incorporate unsubstantiated claims in hypothetical question to VE or by extension, the ultimate RFC).

The ALJ's well articulated rejection of Dr. Green's disability opinion is consistent with my own review of the records showing multiple observations that Plaintiff was able to stand without difficulty and exhibited normal muscle strength and tone (Tr. 552, 555, 459, 793, 634). Plaintiff's ability to engage in outdoor activities including camping, archery, hunting, the use of an all-terrain vehicle, driving, and cutting brush (Tr. 425, 502, 505, 566, 601) also undermines the conclusion that he required to elevate his leg for 50 percent of his waking hours. For these reasons, the ALJ did not err rejecting Dr. Green's disability opinions.

### B. The Adoption of Dr. Khalid's Non-Examining Assessment

Plaintiff also contends that ALJ erred by adopting Dr. Khalid's June, 2016 non-examining finding that Plaintiff could perform exertionally light work. ECF No. 15, PageID.888. Aside from the fact that for the period under consideration, Dr. Khalid's non-

examining assessment is generally accorded less weight than a treating opinion, Plaintiff points out that Dr. Khalid's assessment did not address the records from July, 2016 forward. He contends that the ALJ erred by adopting an assessment that was both non-examining and outdated.

"The Social Security regulations classify 'acceptable medical sources into three types: non-examining sources, nontreating (but examining) sources, and treating sources.'" *Brooks v. Commissioner of Social Sec.*, , 531 Fed.Appx. 636, 641 (August 6, 2013)(*citing Smith v. Commissioner of Social Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)). Under the law in effect at the time Plaintiff filed his application for benefits, "a nonexamining source's opinion is [generally] given less deference than an examining source's opinion, which is given less deference than a treating source." *Id.* at 642 (*citing Norris v. Commissioner of Social Sec.*, 461 Fed.Appx. 433, 439 (6th Cir. February 7, 2012)). Thus, Dr. Green's treating findings would generally be entitled to more weight than Dr. Khalid's. However, "'[i]n appropriate circumstances, opinions from State agency medical and psychological consultants ... may be entitled to greater weight than the opinions of treating or examining sources.'" *Brooks* at 642 (*citing* SSR 96–6p, 1996 WL 374180, at *3 (1996)). Under 20 C.F.R. § 404.1527(e)(2)(I), findings by non-examining state agency consultants may be entitled to significant weight on the basis that they are "highly qualified . . . experts in Social Security disability evaluation."

The ALJ accorded "great weight" to Dr. Khalid's June, 2016 finding that Plaintiff could perform light work, noting that in contrast to Dr. Green's assessment, it was consistent with the record as a whole showing good muscle tone, normal neurologic signs, and full strength (Tr. 26, 28). "The ALJ is entitled to disregard the treating physician's opinion where it is not supported by clinical findings or medical evidence." *Carter v. Commissioner of Social Sec.*, 36 Fed.Appx. 190, 191, 2002 WL 1272114, at *2 (6th Cir. June 6, 2002)(*citing*

*Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir.1994)).   As such, the ALJ did not err by instead adopting Dr. Khalid's well supported non-examining findings (Tr. 86).   As such, her conclusions should remain undisturbed.

For overlapping reasons, Plaintiff's argument that Dr. Khadid's opinion was entitled to reduced weight because he did not have benefit of the treating records from July, 2016 forward does not provide a basis for remand.   To be sure, "[w]hen an ALJ relies on a non-examining source who 'did not have the opportunity to review' later submitted medical evidence, especially when that evidence 'reflects ongoing treatment,'" the courts "require 'some indication that the ALJ at least considered these new facts before giving greater weight to an opinion that is not based on a review of a complete case record.'" *Brooks*, *supra,* 531 Fed.Appx.  at 642 (6th Cir. August 6, 2013)(*citing Blakley v. Commissioner of Social Sec.*, 581 F.3d 399, 409 (6th Cir. 2009))(internal citations omitted).

However, Plaintiff's argument fails for two reasons.  First, the ALJ provided more than "some indication" that she considered the later findings by devoting over a half page to the records created between July, 2016 and February, 2018 (Tr. 24-25).   She cited the cardiologic records showing that Plaintiff's condition was well managed (Tr. 24-25).   The records post-dating Dr. Khadid's assessment, if anything, tend to undermine Plaintiff's claim of disabling lower extremity limitations.   In July, 2016, Plaintiff reported that he hunted and planed to go camping later the same month (Tr. 502, 505).   Dr. Green's examination records from the second half of 2016 do not show that Plaintiff's leg condition worsened (Tr. 625, 628, 631) and in fact, Dr. Green's August, 2017 records note a normal gait (Tr. 634).   Second, in reviewing the newer records, the ALJ noted a 2017 diagnosis of Chronic Obstructive Pulmonary Disorder ("COPD") (Tr. 25).   In consideration of that condition, she included environmental limitations not found in Dr. Khadid's assessment in the hypothetical

-19-

question to the VE and the RFC (Tr. 22, 70).  The  ALJ not only considered and discussed the more recent records but modified the RFC accordingly.  As such, her adoption of Dr. Khalid's findings does not warrant a remand.

In closing, my recommendation to uphold the administrative findings should not be read to trivialize Plaintiff's legitimate limitations as reflected by the record.  Nonetheless, because the ALJ's findings are well within the "zone of choice" accorded the administrative fact-finder, they should not be disturbed by this Court.  *Mullen v. Bowen, supra.*

## VI.  CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #21] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #15] be DENIED.

Any objections to this  Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).

Any objections must be labeled as "Objection #1," "Objection #2," etc., and any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party must file

a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," *etc.*

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: November 12, 2019          s/R. Steven Whalen
                                  R. STEVEN WHALEN
                                  UNITED STATES MAGISTRATE JUDGE


## CERTIFICATE OF SERVICE

I hereby certify on November 12, 2019 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically.  I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants November 12, 2019.

                                  s/Carolyn M. Ciesla
                                  Case Manager for the
                                  Honorable R. Steven Whalen